11 CIV 3249

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAVAN INVESTMENTS, LLC,

Plaintiff,

-against-

BANK OF AMERICA CORPORATION; CREDIT
SUISSE GROUP AG; J.P.MORGAN CHASE &
CO.; HSBC HOLDINGS PLC; BARCLAYS
BANK PLC; LLOYDS BANKING GROUP PLC;
WESTLB AG; UBS AG; ROYAL BANK OF
SCOTLAND GROUP PLC; DEUTSCHE BANK
AG; and CITIBANK NA,

Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Ravan Investments, LLC ("Plaintiff"), by its counsel, brings this action against

Defendants, pursuant to the Sherman Act, 15 U.S.C. § 1, and the Commodity Exchange Act, 7

U.S.C. §§ 1, *et seq.* (the "CEA"), on behalf of itself and all others who, between at least 2006

and 2009, and perhaps later (the "Class Period"), transacted Libor-based contracts or financial

instruments whose value declines as Libor declines. Plaintiff's allegations are based upon

personal knowledge with respect to its conduct and upon information and belief as to other

allegations based on facts obtained during the course of its attorneys' investigation.

### SUMMARY OF ALLEGATIONS

1.      This case involves the manipulation and suppression of the London InterBank

Offered Rate ("Libor") by the Defendants who, among others, self-report the interest rates that

are used to calculate Libor. Defendants are major financial institutions who have substantial

economic exposure to interest rates, including exposure to Libor. Defendants, therefore, both

control the rate at which Libor is set and can reap substantial profits – or face large losses – depending on where Libor is set.

2.     Libor is an interest rate that is determined on a daily basis and is used to price numerous fixed income products including: interest rate swaps, futures, options, and other derivative products. Defendants and several other major banks report the rate at which they do or could borrow funds "by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11am London time." The British Bankers Association ("BBA") excludes the top and bottom four reported rates and then averages the rest of the self-reported rates to calculate the daily Libor. Libor is calculated in various different maturities and across different currencies, though this case deals only with Dollar-based Libor.

3.     While actual trading activity acts as a reality check on market-priced instruments, self-reported Libor rates face no similar check and therefore are much more susceptible to manipulation.

4.     Throughout the Class Period, Libor broke from long-standing relationships with other market-priced financial instruments. Market-priced financial instruments such as the bid rate on Eurodollar deposits ("Eurodollar Bid Rate") and credit default swaps ("CDS") belie the notion that Libor was not manipulated during the Class Period. These market-priced instruments indicate that self-reported Libor rates were divorced from reality. As described more fully below, the disconnect during the Class Period between market-priced financial instruments and self-reported Libor shows that the Defendants were either leaving a huge, multi-billion Dollar arbitrage opportunity on the table or were manipulating Libor. Defendants were not leaving an enormous opportunity on the table – to the contrary, they were creating a new, though unlawful, opportunity for themselves.

5.      Defendants' manipulation of Libor can also been seen in Defendants' curious Libor reporting practices during the Class Period.  Because the BBA excludes the top and bottom four reported rates, if the reporting banks collude and know what the other banks will be reporting, they can most effectively manipulate Libor by bunching their reported rates around the fourth lowest rate (if they want to suppress Libor) or the fourth highest rate (if they want to inflate Libor).  Empirically, during the Class Period, there was substantial bunching of reported rates near the fourth lowest rate.  For example, during the July – October 2009 period there were almost two hundred self-reported rates identical to this lower bound.  An academic study of Libor found "pronounced bunching" of self-reported rates during the first two quarters of 2009.  Absent collusion, one would not expect Defendants' self-reported rates to be clumped around the lower (or higher, or any) bound.

6.      Defendants' self-reported rates showed other anomalies that are unexpected absent manipulation.  For example, certain Defendants' self-reported rates to the BBA were lower than competitor banks' for Dollar-based Libor but were higher (when compared to those same competitor banks) for Yen-based Libor.   While interest rates may differ between currencies, the positioning of the same banks across currencies should not change – that is, if Bank A reports a *higher* Yen-based Libor than Bank B, Bank A should not simultaneously report a *lower* Dollar-based Libor than Bank B, yet that is exactly what occurred.  Empirical evidence demonstrates numerous such discontinuities, which are further evidence of manipulation.

7.      Strategists employed by several Defendants estimated that Libor rates during the Class Period were substantially suppressed.  Defendant Citibank's Scott Peng stated that Libor was suppressed by 30 basis points ("bps").[1]  Defendant Credit Suisse's William Porter estimated

---

[1]        100 basis points equal 1%.

an even greater suppression: 40 bps. And Barclays Capital's Timothy Bond, when describing the repercussions when Barclays Capital decided for a limited time "to quote the right rates," admitted that "[t]he rates the banks were posting to the BBA became a little bit divorced from reality." Other analysts agreed with these assessments. An October 28, 2008 "Client Alert" from the law firm Milbank, Tweed, Hadley & McCloy LLP noted that: "Lenders in the bank loan market have expressed increasing frustration over the apparent fact that the publicly quoted LIBOR is lower than the actual rates they pay for Eurodollar deposits[.]"

8.     Defendants manipulated Libor to line (or stop the hemorrhaging from) their own pockets. Defendants trade enormous amounts of swaps, loans, Eurodollars, and other financial instruments whose value is directly tied to Libor. During the Class Period, Defendants stood to make more or lose less money if interest rates were lower, so Defendants colluded and suppressed the Libor rate. The artificially low Libor rate allowed Defendants to earn billions of dollars that they would not otherwise have earned had Libor not been suppressed. Though Defendants did make loans whose interest rates were based on Libor, Defendants attached Libor floors to many of those loans so that Defendants would continue to be paid a substantial interest rate on those loans even if Libor rates were exceedingly low.

9.     Plaintiff alleges that Defendants' unlawful and intentional misreporting, suppression and manipulation of Libor rates, as well as their efforts to restrain trade in the market for Libor-based derivatives during the Class Period, were in violation of Sections 4s(h), 9(a)(2) and 22(a) of the CEA and the Sherman Act, 15 U.S.C. § 1. Defendants' suppression of Libor caused Plaintiff and other members of the proposed Class to pay more and/or receive less from Libor-based financial instruments and Plaintiff and the Class were directly injured by this misconduct.

## JURISDICTION AND VENUE

10.     This action arises under Section 1 of the Sherman Antitrust Act, Section 22 of the CEA, 7 U.S.C. § 25, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), and 28 U.S.C. § 1391(b), (c) and (d).   Each of the Defendants transacted business in the this District and a substantial part of the events or omissions giving rise to the claims here occurred in this District.  Defendants' unlawful conduct manipulated the prices of Libor-based derivative products traded in this District.

## PARTIES

13.     Plaintiff Ravan Investments, LLC ("Ravan" or "Plaintiff") is a Florida limited liability company, with its principal place of business located at 7330 N.W. 36th Avenue, Miami, Florida 33147.  Ravan transacted Libor-based financial instruments directly with one or more of the Defendants and received less money from, or paid more money to, that Defendant because the Libor rate was lower than what it would have been absent Defendants' unlawful conduct.

14.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina.  During the Class Period, Bank of America was a member of the British Bankers' Association's U.S. Dollar Libor panel.

15.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in offices in Zurich, Switzerland. During the Class Period, Credit Suisse was a member of the British Bankers' Association's U.S. Dollar Libor panel.

16.     Defendant J.P. Morgan Chase & Co. ("JP Morgan") is a Delaware financial holding company headquartered in New York, New York. During the Class Period, JP Morgan was a member of the British Bankers' Association's U.S. Dollar Libor panel.

17.     Defendant HSBC Holdings plc ("HSBC") is a British public limited company headquartered in London, England. During the Class Period, HSBC was a member of the British Bankers' Association's U.S. Dollar Libor panel.

18.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England. During the Class Period, Barclays was a member of the British Bankers' Association's U.S. Dollar Libor panel.

19.     Defendant Lloyds Banking Group plc ("Lloyds") is a British public limited company headquartered in London, England. Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB"). A During the Class Period, both HBOS and Lloyds TSB were members of the British Bankers' Association's U.S. Dollar Libor panel.

20.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany. During the Class Period, WestLB was a member of the British Bankers' Association's U.S. Dollar Libor panel.

21.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. During the Class Period, UBS was a member of the British Bankers' Association's U.S. Dollar Libor panel.

6

22.     Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a British public limited company headquartered in Edinburgh, Scotland.  During the Class Period, Royal Bank of Scotland was a member of the British Bankers' Association's U.S. Dollar Libor panel.

23.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.   During the Class Period, WestLB was a member of the British Bankers' Association's U.S. Dollar Libor panel.

24.     Defendant Citibank NA ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup, Inc., which is headquartered in New York, New York.  During the Class Period, Citibank was a member of the British Bankers' Association's U.S. Dollar Libor panel.

## FACTUAL ALLEGATIONS

### Libor Background

25.     Libor is a rate that is determined on a daily basis and tied to the interest rates at which banks borrow unsecured funds from other banks in the London interbank lending market. Simply, Libor is the rate at which banks will lend to each other.

26.     Libor is calculated and published by Thomson Reuters on behalf of the BBA mid-morning London time daily during the work week.  For Dollar-based Libor, sixteen banks self-report the rates across the interest rate curve at which they could borrow from other banks; Thomson Reuters excludes the four lowest and the four highest self-reported rates and averages the middle eight rates for each maturity; that average is the Libor rate for the day for each maturity.

27. Libor is calculated for a number of different currencies and for various maturities from overnight out to one year; the most commonly used and most important Dollar-based Libor rate is 3-month Libor.

28. The BBA defines Libor as: "The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 London time."

29. Libor rates represent unsecured loans between banks and should therefore differ (and be greater than) secured loans which offer the lender greater protection than unsecured loans.

30. Libor is not an actively traded rate that one can see in the market, so the BBA relies on self-reporting banks to accurately disclose their borrowing costs.

31. Libor is a primary benchmark for short-term interest rates and many derivative products are priced based on Libor, meaning that one who wishes to manipulate the price of these derivatives need only manipulate Libor.

32. For example, Eurodollar contracts based on Libor are some of the most heavily traded interest rate products in the world and are traded on electronic and physical exchanges like the CME and over-the-counter. The final settlement price of a Eurodollar contract is 100 minus the Libor rate (*e.g.*, if the Libor rate on the relevant date is 3.00%, the value of that Eurodollar contract is 97; suppression of Libor causes higher prices for Eurodollar contracts). This linear relationship shows the interconnectedness between Libor and numerous derivative instruments based on Libor.

33. Interest rate swaps ("swaps") are another type of financial instruments based on Libor. In a swap, one party pays a fixed rate on a notional amount of money, and the other party

pays a floating rate, most commonly based on 3-month Libor, on that same notional amount of money. Swaps allow entities to hedge interest rate exposure to better match their asset-liability mix. Swaps also allow entities to make investments based on their view of the future direction of interest rates. For example, an entity that believes that interest rates will rise may decide to pay fixed and receive floating so that when interest rates rise, as expected by that entity, the floating rate received will rise while the fixed rate paid will not change.

34.     Swap contracts are traded on electronic and physical exchanges like the CME and over-the-counter. Like the Eurodollar contracts described above, many of these contracts are based explicitly on Libor.

35.     Holders of swap contracts are impacted if Libor rates are manipulated. When Libor rates are suppressed, entities that are receiving Libor and paying a fixed rate receive less/pay more than they otherwise would absent the manipulation of Libor.

36.     Major banks like the Defendants here generally have huge exposure to interest rates and enormous swaps positions. For example, in the third quarter of 2007, Defendant JP Morgan was exposed to nearly $60 *trillion* in swaps.

37.     Defendants were motivated to manipulate Libor to increase their profitability or decrease their losses. During the Class Period, the longstanding relationships between self-reported Libor and other market-based rates broke down because Defendants suppressed Libor.

38.     Libor during the Class Period did not spike during the financial crisis as much as other interest rates did and the individual rates reported by each of the Defendants did not vary to account for the different financial conditions and therefore different credit risks of each of the Defendants.

**Market-Based Rates Show Libor Manipulation**

39.     Following Defendants' manipulation of Libor, traditional relationships between Libor and true market-based interest rates – *i.e.*, rates that are based on actual financial transactions and not just on self-reported figures susceptible to easy manipulation – broke down. For over two decades following Libor's inception in 1984, Libor has been approximately 6 to 12 basis points ("bps") *above* the market-based Eurodollar Bid Rate – the rate that banks bid in the market for Dollar deposits. This makes sense as one would expect a bid-offer spread between what banks are willing to pay to attract Dollar deposits (*i.e.*, the Eurodollar Bid Rate) and the rate at which banks are offered Dollar deposits by other banks (*i.e.*, Libor). That is, historically, if the rate at which banks bid to attract money (*i.e.*, the Eurodollar Bid Rate) were 3.00%, the rate at which banks would offer money to other banks (*i.e.*, Libor) would be 3.06% to 3.12%.

40.     In mid 2007, this longstanding relationship between the Eurodollar Bid Rate and Libor broke down and inverted when the Eurodollar Bid Rate increased far more than Libor. Absent manipulation, it makes no economic sense for the Eurodollar Bid Rate – the rate banks actually pay to attract deposits – to be *higher* than the Libor rate – the rate at which banks report that they are able to borrow money.  Absent substantial transaction costs (which are minimal here), in any market where the bid is above the offer transactions will occur and the bid will drop and/or the offer will rise, or both, until there is a spread with the bid being below the offer.  That has not been seen in the Eurodollar Bid Rate and Libor relationship since mid-2007.  The following chart graphs the difference between Libor and the Eurodollar Bid Rate from 2006 through mid-2009.  The chart shows that in August 2007 the long-standing relationship between Libor and the Eurodollar Bid Rate broke down and inverted such that the bid side (the Eurodollar

Bid Rate) is higher than the offer rate (Libor), and so the difference between the offer and the bid was negative.



41.     The credit default swap ("CDS") market allows traders to purchase insurance and otherwise take positions on the financial health of other entities and sovereigns. For example, an entity who purchases a CDS on a bundle of Citibank bonds would receive a payout if Citibank defaulted on those bonds. On the other side of the trade, an entity that sells a CDS on Citibank has similar exposure to Citibank as if the entity had purchased Citibank bonds or made a loan to Citibank. As a company's financial health deteriorates or is seen to deteriorate, the cost of purchasing a CDS on that company rises.

42.     The price of a loan to a specific company should be the sum of the CDS spread (which accounts for the credit risk) and the risk-free rate.

43.     During the financial crisis many companies, and especially many banks, were or were perceived to be on unsound financial footing. This caused CDS on those entities to rise substantially at the beginning of the Class Period.

44.     While CDSs insuring against default by the Defendants spiked during the Class Period, Defendants' self-reported Libor rate – the rate as which Defendants claimed they could borrow from other banks – did not increase to the same extent.

45.     The breakdown in the relationship between CDS and Libor is further evidence of Defendants' manipulation of Libor. If an entity wants exposure to a certain bank, e.g., Citibank, it could loan money directly to Citibank (in which cases the entity would receive interest from Citibank and be exposed to Citibank's credit risk) or the entity could sell a CDS on Citibank (in which case the entity would receive the premium from the CDS and be exposed to Citibank's credit risk).

46.     During the Class Period certain Defendants were self-reporting Libor rates so that that a trader who made that loan and then purchased CDS protection against that bank would earn a negative return. This makes no economic sense.

47.     During the Class Period, certain Defendants' self-reported Libor rates were substantially below the premium that investors would have earned had they sold CDS on Defendants. For example, Defendant Citibank was self-reporting Libor rates below the market-rate of CDS on Citibank loans/bonds. This makes no economic sense as the price of the loan should be the premium earned on CDS plus the risk-free rate. The below chart shows: (1) that Citibank and Bank of Tokyo both reported *nearly identical* Libor rates at the same time that the CDS market valued the riskiness of each bank rather differently, and (2) that the Citibank CDS spread was *greater* than Citibank's Libor quote, a nonsensical proposition.

**One Year LIBOR Quotes and CDS Spreads**



48.  An analysis in THE WALL STREET JOURNAL found that Defendants' self-reported Libor rates did not correspond to Defendants' credit risk as measured in the CDS market. That analysis also found that Defendants with substantially different credit risks still reported identical Libor rates.

49.  Defendant Citibank's self-reported rates differed the most from market-priced CDS.  Citibank's self-reported rates averaged approximately 87 bps lower than the rate calculated using CDS pricing. Defendant WestLB's self-reported rates were lower by 70 bps,

Defendant HBOS's rate was 57 bps lower; Defendant JP Morgan's was 43 bps lower, and this trend continued for the other Defendants. In addition, in March, 2008, Defendant WestLB reported the same Libor rate as Defendant Credit Suisse even though WestLB, in the CDS market, was seen as twice as likely to fail as was Credit Suisse. None of these self-reported rates make economic sense when compared to the actual market rates derived from CDS pricing.

50.    Trading in loans auctioned by the Federal Reserve – which, unlike Libor, do require collateral – further demonstrates Defendants' manipulation of Libor. At certain points during the Class Period, interest rates on collateralized loans from the Federal Reserve to banks were *higher* than the comparable self-reported Libor rate, which represents *un*collateralized loans between banks. For example, in late 2008, the rate for the Federal Reserve's 28-day term auction facility (under which borrowings are secured) was 3.75% while the simultaneous rate of one-month Libor (under which borrowings are unsecured) was 3.19%. This makes no economic sense as uncollateralized loans are more risky and should have a higher interest rate than collateralized loans.

51.    Bids in the market for commercial paper, in which banks and companies issue short-term IOUs to investors to satisfy their temporary liquidity needs, showed the suppression of Libor. For example, in April 2008, Defendant UBS was willing to pay 2.85% for money in the commercial paper market while at the same time reporting that it could borrow money from other banks at 2.73%. Again, it makes no economic sense for UBS to bid 12 bps more than where money is offered – unless money is not really offered at that artificially low level.

**Defendants' Self-Reporting Of Libor Is Anomalous And Indicates Manipulation**

52.    Defendants' actual reporting of their own borrowing costs to the BBA (i.e., the rates that feed into the Libor calculation) provide further evidence of Defendants' manipulation.

As described below, Defendants' self-reported rates (a) were bunched near inflections points; (b) differed in ranking depending on the currency involved; and (c) lacked the differentiation between different Defendants that one would expect given differing credit risks among Defendants.

53.     Because the four lowest rates and the four highest rates submitted to the BBA are excluded from the calculation of Libor, an entity or group wishing to suppress Libor would attempt to coordinate as many bids as possible at or just above the fourth-highest Libor rate. Similarly, an entity or group wishing to inflate Libor would attempt to coordinate as many bids as possible at or just below the thirteenth-highest Libor rate.  Absent collusion, one would not expect to find the self-reported rates bunched at these points.

54.     During the Class Period, Defendants' self-reported rates clustered closely together, both in an absolute sense and relative to corresponding CDS pricing.  Prior to August 2007, Libor and CDS quotes were similar and low.  Absent collusion, one would expect the distribution of self-reported Libor rates to more closely mirror the distribution of CDS quotes.

55.     Once the financial crisis began, both the absolute level and the variation of CDS quotes between different entities increased.  However, at the same time, Libor rates did not increase as much as CDS quotes and Libor rates tended to be bunched together more, and bunched together around the fourth lowest Libor rate – exactly the behavior that would most efficiently suppress the overall Libor rate.  Defendants' self-reported rates – both absolutely and the bunching of those rates – make no sense when compared to market-priced CDS rates.

56.     The figure below shows graphically the distribution of the market-priced CDS quotes and the self-reported Libor rates.  Though on would expect the distributions shown on each chart to be similar, in reality the Libor quotes demonstrate the bunching consistent with

Defendants' manipulation of Libor while the CDS quotes show a more normal distribution. The chart also shows the bunching of quotes near the fourth-lowest quote.



57.   A May 29, 2008 article in THE WALL STREET JOURNAL reports on an extensive investigation performed by the Journal into Libor rates. The Journal's study – which was reviewed and found reliable by professors from Stanford University, Columbia University, and the London Business School – found that during the first four months of 2008 the 3-month Libor rates self-reported by Defendants remained on average within a very tight range of 6 bps despite the fact that different Defendants were facing and were perceived to be facing different financial risks. Stanford finance professor Darrell Duffie stated that Defendants' self-reported rates "are far too similar to be believed" and David Juran, a statistics professor at Columbia, said that the

Journal's analysis "very convincingly" shows that Defendants' self-reported rates are lower than what the market indicates. This tight range shows that Defendants were not only manipulating Libor, but were doing so in concert.

58.     Defendants' self-reported Libor rates in different currencies provide further evidence of Defendants' manipulation of Libor. During the Class Period it was common for banks to switch their ranking in Libor self-reporting when dealing in different currencies. For example, Defendant Bank of America regularly quoted a *lower* Dollar-based Libor than Bank of Tokyo-Mitsubishi while simultaneously quoting a *higher* Yen-based Libor than Bank of Tokyo-Mitsubishi. Similarly, Citibank often self-reported rates at the top of the Yen-Libor scale while simultaneously quoting rates at the bottom of the Dollar-Libor scale.

59.     Because a given bank presents the identical credit risk regardless of which currency the bank is dealing, there is no legitimate economic reason for the banks to switch ordering depending on the currency. That is, if Bank A self-reports the lowest Dollar-Libor, it should (assuming the same bucket of banks constitute each Libor panel) also report the lowest Yen-Libor rate. Empirically, this did not happen during the Class Period. Instead, Defendants' manipulation of Dollar-Libor caused the cross-currency relationship to decouple.

**Investigations Of Libor Rate Setting**

60.     Numerous regulators, professional organizations, analysts, and news agencies have or are investigating Defendants' self-reported Libor rates.

61.     On March 15, 2011, Defendant UBS disclosed that it had received subpoenas from the United States Securities and Exchange Commission, the Commodity Futures Trading Commission and the Department of Justice, seeking information concerning "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate

LIBOR at certain times." UBS reported that the Japanese Financial Supervisory Agency also requested information relating to UBS's Libor self-reporting.

62.     The March 15, 2011 Financial Times reported that the United Kingdom's Financial Services Authority had requested similar information from UBS.

63.     The March 15, 2011 Financial Times also reported that Bank of America, Citibank and Barclays had received subpoenas and that "[a]ll the panel members are believed to have received at least an informal request for information[.]"

64.     On April 3, 2008, the Bank of England money-market committee held a meeting of United Kingdom banks. The minutes of that meeting state that: "U.S. Dollar Libor rates had at times appeared lower than actual traded interbank rates."

65.     According to the Wall Street Journal, in early 2008 two economists from the Bank of International Settlements "expressed concerns that banks might report inaccurate rate quotes" to the BBA for Libor setting purposes.

66.     Citibank's interest-rate analyst Scott Peng wrote in April 2008 that "Libor at times no longer represents the level at which banks extend loans to others."

67.     Following an April 16, 2008 article in the Wall Street Journal concerning doubtful Libor rates, Dollar-based 3-month Libor jumped 8 bps – a substantial move – overnight, strongly indicating that the Libor rate was being manipulated.

**Defendants Were Motivated Financially To Suppress Libor**

68.     During the Class Period, Defendants were biased towards lower interest rates – *i.e.*, they stood to profit more (or loose less) if interest rates, including Libor, were lower. For example, Defendant Citibank acknowledged in early 2009 that its net interest revenue would increase by nearly $1 billion if interest rates fell by 1% over the course of one year – and by

nearly $2 billion if interest rates immediately fell by 1% and remained that way for one year. As explained above, during this period Citigroup reported Libor rates near the bottom of the effective range, helping pushing the Libor rate lower than it otherwise would have been.

69.     Defendants are registered swap dealers or major participants in the swap market. Interest rate swaps are often tied directly to Libor, most commonly to 3-month and 6-month Libor. During 2009, Defendants JP Morgan Chase and Bank of America *each* had nearly $50 *trillion* notional value of interest rate swaps on their books – more than three times the notional value of interest rate swaps that Citibank had – making the potential impact of Libor rates even greater for those Defendants.

70.     While Defendants did make loans tied to Libor during the Class Period, they protected themselves from the artificially low Libor rates that they created by instituting "floors" on their loans such that even if Libor rates were severely depressed, the interest that Defendants would receive on the loans that they made would be paid at the floor, which was higher than the actual (albeit artificially suppressed) Libor rate.

71.     Though Libor floors were not common prior to the beginning of the Class Period, as one commentator notes: "Libor floors have been commonly used in the low Libor environment which started in early 2008." According to one money manager, in 2008 Libor floors were rare but by 2010 every new high yield loan was written to include a fixed floor.

72.     Libor floors allowed Defendants to suppress Libor and earn huge profits on their swap and other derivative positions while not sacrificing much yield from their loan portfolios.

**Public Reporting Fostered Easy Monitoring Of Libor Rate Quotes**

73.    Libor rates were reported daily by each of the Defendants. These rates were also reported publicly so that Defendants could know where to bid the next day and would know if any of their co-conspirators had broken from their agreement to suppress the price of Libor.

74.    Before the financial crisis began in mid-2007, the market-priced Eurodollar Bid Rate was a good indicator of the next day's Libor rate. Banks could take the Eurodollar Bid Rate from the prior day, add the 6-12 bps spread discussed above, and arrive at the proper Libor rate. When the relationship between the Eurodollar Bid Rate and Libor decoupled following Defendants' manipulation of Libor, the Eurodollar Bid Rate ceased to be a good indicator of the next day's Libor. Instead, during the Class Period, the lagging Libor rate (*i.e.*, the prior day's Libor) offered far more predictive power for subsequent Libor rates.

75.    Because Libor rates are set and published each day, Defendants were able to coordinate their manipulation and suppression of Libor without constant communications between Defendants.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23, on its own behalf and as representatives of the following class of persons and entities (the "Class"):

> All persons, corporations and other legal entities (other than Defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators) that, during the period from at least 2006 through 2009 (the "Class Period") (a) purchased directly from Defendants Libor-based financial instruments whose values increase as Libor decreases; (b) sold directly to Defendants Libor-based derivatives whose values decline as Libor decreases; (c) received payments directly from Defendants which decrease as Libor decreases and/or increase as Libor increases; or (d) purchased Libor-based derivatives whose values increase as Libor decreases, or sold Libor-based derivatives whose values decline as Libor decreases.

77.     The Class is individually so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, based on the nature of the financial instruments involved, Plaintiff reasonably believes that there are at least thousands of members in the Class. Class members are geographically dispersed throughout the United States.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

    a.  Whether Defendants' conduct constituted a manipulative or unlawful act;

    b.  Whether Defendants manipulated Libor-based derivatives;

    c.  Whether Defendants conspired to manipulate Libor-based derivatives;

    d.  Whether Defendants agreed or conspired to suppress, fix, or maintain Libor-based derivatives in violation of the antitrust laws;

    e.  The geographic scope and duration of Defendants' manipulation of Libor-based derivatives;

    f.  Whether Defendants' unlawful conduct caused injury to the business or property of the Plaintiff and the Class;

    g.  The fact and amount of impact on Libor-based derivatives prices caused by Defendants' conduct; and

    h.  The appropriate measure of damages.

79.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class have all sustained damage in that during the Class Period they transacted financial instruments tied to Libor, which was suppressed by Defendants.

Defendants' conduct, the effects of such conduct, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class members.

81.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class.

## FRAUDULENT CONCEALMENT

82.     Throughout the relevant time, Defendants and their co-conspirators have affirmatively and wrongfully concealed their unlawful conduct from Plaintiff and the Class.

83.     By its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended upon its self-concealing nature.

84.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

85.     To avoid detection, Defendants met and communicated secretly concerning Libor rate setting.

86.     During the relevant time, Defendants and co-conspirators repeatedly claimed that Libor was not being manipulated and that the process for determining Libor was sound.  These statements were a pretext to conceal Defendants' conspiracy to suppress Libor.

87.     Plaintiff and members of the Class reasonably relied on the materially false or misleading explanations by Defendants, which lulled Plaintiff and members of the Class into believing that Libor had not been manipulated and was not artificially suppressed.

88.     Defendants' public statements about Libor rates were designed to, and did, cause Plaintiff and members of the Class to accept those rates without undertaking further inquiry. Even if such an inquiry had been undertaken, it would have proven futile because Plaintiff and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications were valid

89.     At the time, Plaintiff and members of the Class considered Defendants' articulated reasons for the Libor reporting to be both normal and legitimate, and, accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' Libor reporting.

90.     Plaintiff and members of the Class could not have discovered the alleged conspiracy at a date earlier than March 15, 2011, by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and wrongfully conceal, their conspiracy.

91.     It was not until March 15, 2011, the date on which it was publicly disclosed that the United States was investigating UBS's Libor rate setting, that Plaintiff and members of the

Class became aware, or could have become aware with the exercise of reasonable diligence, of Defendants' unlawful conduct regarding Libor rate reporting.

92.     The conspiracy that is the subject of this action was fraudulently and wrongfully concealed by Defendants by various means and methods, including, but not limited to: (a) secret meetings; (b) misrepresentations to their customers and the public concerning the Libor rate; and (c) surreptitious communications among Defendants by the use of the telephone or in-person meetings and through private e-mail accounts in order to limit the existence of written records, minimize access to any written records, and conceal from non-conspirators the existence and nature of their discussions regarding their scheme to suppress Libor.

93.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by defendants and their co-conspirators until March 15, 2011, Plaintiff and members of the Class had no knowledge of the conspiracy that is the subject of this action nor of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

94.     None of the facts or information available to Plaintiff and members of the Class prior to March 15, 2011, if investigated with reasonable diligence, could or would have led, nor did lead, to the discovery of the conspiracy that is the subject of this action.

95.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been equitably tolled as to any claims of Plaintiff or members of the Class arising from Defendants' unlawful conduct that is the subject matter of this Complaint.

## COUNT I
## VIOLATION OF SHERMAN ACT SECTION 1
### (15 U.S.C. § 1)

96.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

97.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Action and Section 4 of the Clayton Act.

98.     During the Class Period, Defendants controlled what Libor rate would be reported and therefore controlled prices in the market for Libor-based derivative contracts.

99.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and/or made artificial prices for Libor-based derivative contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

100.    Defendants' conspiracy, and resulting impact on the market for Libor-based derivative contracts, occurred in an affected interstate and international commerce.

101.    As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

102.    Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II
## VIOLATION OF THE COMMODITY EXCHANGE ACT
### (7 U.S.C. § 1, *et seq.*)

103.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

104.   The CME has been designated by the Commodity Futures Trading Commission ("CFTC") as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in various Libor-based futures, options, swaps and other derivative products.  CME is an organized, centralized market that provides a forum for trading Libor-based futures, options, swaps and other derivative products.

105.   As to the CME Libor-based derivatives, by their intentional misconduct, the Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and manipulated prices of Libor-based derivative contracts during the Class Period.

106.   Defendants' activities alleged herein constitute market power manipulation of the prices of CME Libor-based derivatives in violation of Sections 4s(h), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 6s(h), 13(a) and 25(a).

107.   Defendants' extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

108.   Plaintiff and others who transacted in CME Libor-based derivative contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

109.   Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

## COUNT III
## VICARIOUS LIABILITY UNDER THE COMMODITIES EXCHANGE ACT

110.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

111.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and its counsel as Class Counsel;

(B)    For a judgment awarding Plaintiff and the Class damages against Defendants for their violation of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(C)    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(D)    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' fee and expenses; and

(F)    For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury.

Dated: New York, New York
      May 13, 2011

**GRANT & EISENHOFER P.A.**

BY: _____
      Jay Eisenhofer
      Linda P. Nussbaum
      John D. Radice
      485 Lexington Avenue, 29th Floor
      New York, NY 10017
      Tel: (646) 722-8504
      Fax: (646) 722-8501
      jeisenhofer@gelaw.com
      lnussbaum@gelaw.com
      jradice@gelaw.com

      Michael E. Criden
      Kevin B. Love
      **CRIDEN & LOVE, P.A.**
      7301 S.W. 57th Court, Suite 515
      South Miami, Florida 33143
      Tel:  (305) 357-9010
      Fax:  (305) 357-9050
      mcriden@cridenlove.com
      klove@cridenlove.com